IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,      )
                          ) Criminal Action
                  Plaintiff,  ) No. 23-cr-138
                          )
vs.                        ) SENTENCING
                          )
Jessica Reyher,          ) Washington, DC
Arthur Reyher           ) February 27, 2024
                          ) Time:  10:08 a.m.
              Defendants.  )
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE JUDGE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For Plaintiff:     Ashley Akers
                  DOJ-CIV
                  Commercial Litigation Branch
                  1100 L Street Northwest
                  Washington, DC 20530
                  (202) 353-0521
                  Email:  Ashley.akers@usdoj.gov

                  Monika Beata Jasiewicz
                  Kathryn E. Bolas
                  U.S. ATTORNEY'S OFFICE
                  601 D Street NW
                  Washington, DC 20530
                  202-714-6446
                  Email:  Isia.jasiewicz@usdoj.gov
                  Email:  Kathryn.bolas@usdoj.gov

For Defendant
  Jessica Reyher:  Elizabeth Ann Mullin
                  FEDERAL PUBLIC DEFENDER FOR DC
                  625 Indiana Ave NW
                  Suite 500
                  Washington, DC 20004
                  (202) 208-7500
                  Email:  Elizabeth_mullin@fd.org

       Arthur Reyher:    Jamie McGrady
                         Burke Wonnell
                         FEDERAL PUBLIC DEFENDER FOR ALASKA
                         188 W. Northern Lights Boulevard
                         Suite 700
                         Anchorage, AK 99503
                         907-646-3400
                         Email:  Jamie_mcgrady@fd.org
                         Email:  Burke_wonnell@fd.org

_____

       Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                                Official Court Reporter
                                United States Courthouse, Room 6523
                                333 Constitution Avenue, NW
                                Washington, DC  20001
                                202-354-3267

\* \* \* \* \* \* \*P R O C E E D I N G S\* \* \* \* \* \* \*

THE COURTROOM DEPUTY:  Good morning, Your Honor.

THE COURT:  Good morning.

THE COURTROOM DEPUTY:  This is criminal matter 23-138, United States of America versus Jessica Reyher as defendant 4 and Arthur Reyher as defendant 5.  On behalf of probation we have Andre Wilson.

May we have counsel approach the lectern, state your name for the record, starting with the government.

MS. AKERS:  Good morning.  Ashley Akers on behalf of the United States.  With me is Monika Beata Jasiewicz, Katherine Bolas, and Special Agent George Paz.

THE COURT:  Good morning.

MS. MULLIN:  Good morning, Your Honor.  Elizabeth Mullin on behalf of Jessica Reyher.

THE COURT:  Good morning.

MS. McGRADY:  Good morning, Your Honor.  Jamie McGrady on behalf of Arthur Reyher.  With me is my co-counsel Burke Wonnell.

THE COURT:  Good morning.

This matter is here today for a sentencing.  And in preparation for the sentencing, I did, regarding both defendants, review the indictment that was filed against them, also the plea agreement that they agreed to plead guilty in reference to.  Also the presentence investigation report for

both defendants.  Also the government's sentencing memorandum. Also the defendant's sentencing memorandum.  And also the sentencing recommendation in both cases by the probation department.

There were five character letters submitted.  All of them seem to be in reference to Mr. Reyher, and one of those letters also referenced Ms. Reyher.

Is there anything else I should have reviewed in preparation for the sentencing, government counsel?

MS. JASIEWICZ:  No, Your Honor.

THE COURT:  Defense counsel?

MS. MULLIN:  Yes, Your Honor.  On behalf of Jessica Reyher, I filed a response to government's sentencing memorandum.

THE COURT:  I did review that.

MS. MULLIN:  I did submit letters on behalf of Jessica Reyher.  Some of them referenced both Arthur and Jessica Reyher.  I believe I submitted six letters.

THE COURT:  I didn't see them.

MS. MULLIN:  I emailed them to chambers, as well as filed them on ECF.  And there was also a letter from Jessica Reyher to the Court that was labeled Exhibit 3.

THE COURT:  For some reason I don't have those.  They didn't reach me for some reason, so I'll have to take a break to review them.

THE COURTROOM DEPUTY:  I can print them, Your Honor.

THE COURT:  I'll take a break and read them.

MS. MULLIN:  They were Exhibit 1 to my sentencing memorandum.  I filed a redacted version and I also filed an unredacted version under seal.  And then last night, the government filed a corrected sentencing memorandum.

THE COURT:  I did get that.

MS. MULLIN:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  I'll print it.

THE COURT:  Okay.

(Recess from 10:16 a.m. to 10:21 a.m.)

THE COURT:  I did now read the letter from Jessica Reyher and also there were additional seven -- six other letters that were submitted on her behalf.  Besides what I've indicated regarding Ms. Reyher, anything else I should have reviewed?

MS. MULLIN:  No.  No.  Thank you, Your Honor.

THE COURT:  What about Mr. Reyher?

MS. McGRADY:  No, Your Honor.

THE COURT:  Okay.  In reference to the presentence investigation reports in reference to both, appear to be no objections by the government, is that right?

MS. JASIEWICZ:  That's correct, Your Honor.

THE COURT:  However, in reference to both defendants, there is an objection to the guideline calculations, arguing

that the new guideline provision authorizing a two-point reduction is appropriate in this case.  Probation takes exception to that position on the grounds that the defendants did in fact engage in violence and, therefore, they're not entitled to the two-point reduction.  So I'll hear from the defense regarding that issue.

MS. MULLIN:  Your Honor, pertinent facts as follows: Ms. Reyher did not physically strike an officer, she did not injure an officer, she did not have the intent to injure an officer, and she did not have direct physical contact with an officer.  She was part of a large crowd that was pushing towards officers, although not at the front of that crowd.

THE COURT:  She was near the front, according to the evidence, and she went into the tunnel on three separate occasions.

MS. MULLIN:  She did, for moments at a time.

THE COURT:  I was speaking.

MS. MULLIN:  I'm sorry, Your Honor.  I apologize.

THE COURT:  She did enter the tunnel on three separate occasions.

MS. MULLIN:  Yes, Your Honor.  And for the vast majority of time that she was in the tunnel, which was three separate occasions for a few minutes at a time, she positioned herself ducked behind her husband.

District judges have applied the 4C1.1 adjustment in

exactly this context in January 6 cases, in which the defendant's conduct was actually far more aggressive towards police officers.  For example -- and this is in my memorandum, Your Honor -- but Judge Bates recently issued an opinion rejecting the violence-by-presence-in-a-mob theory that the government advances here, and applied it over government objection in two cases, one of those cases was a 231 and one of those cases was a 1752.

In one of those cases, *Yang*, one of the defendants grabbed an officer's wrist and was also part of the crowd that stood their ground as officers tried to push the crowd back.  Judge Bates reasoned that the contact made was not made with the intent to harm, nor was it made with fury or vehemence.  And he said the degree of aggressiveness just wasn't enough to qualify as violent for purposes of 4C1.1.  Similarly, Jessica's case -- Jessica Reyher's case lacks the intent to injure and the degree of aggressiveness that Judge Bates found wanting in *Yang*.

Judge Mehta also implicitly rejected the violence-by-presence-in-a-mob theory in *United States versus Parks*, also explained in my sentencing memo.  And in this case the defendant was at the front of the police -- at the front of the crowd, pushing towards the line of police.

Similarly, the Chief Judge, in a case in which the defendant forcibly shoved and pushed through the Rotunda door,

said that 4C1.1 would apply, although it hadn't been promulgated yet. The case law interpreting violence, where it appears elsewhere in the guidelines, supports our arguments and the other district judges' rulings that it would apply in this case. And those cases that support a finding of violence state that there must be more than what Ms. Reyher engaged in here. Those cases support the proposition that there must be an intent to cause injury and a level of aggressiveness that we just don't have here.

So, Your Honor, with respect to -- I'll rest on the papers for the rest of my argument. But again, we don't have here Ms. Reyher intending to cause injury or even coming close to physically contacting an officer and we don't have the level of aggression that would otherwise qualify as violence for purposes of 4C1.1. And, of course, all of the other -- she meets all the other qualifications; she's a first offender, she's never before had any contact with the criminal legal system.

And in terms of what her intent was, that, you know, she didn't say anything on social media prior to going to the rally, she didn't say anything after, she didn't boast about being aggressive towards the police. There's really nothing in her conduct to show she had an intent to be violent toward a police officer or had an intent to injure any police officer, or anyone for that matter.

So, yes, she was part of a large crowd, some of that crowd engaged in explicit and intentional violence, she did not. And just because others in the crowd were violent towards police officers does not mean that she was for purposes of 4C1.1.

THE COURT: Government?

MS. JASIEWICZ: Your Honor, Section 4C1.1 calls for a decrease in the offense level for an offender without criminal history points if, among other criteria here, she did not use violence or credible threats of violence in connection with the offense. Judges on this court have defined violence, with respect to the dictionary definition, as use of physical force, typically accompanied by fury, vehemence, or outrage, and unlawfully exercised with the intent to harm.

Your Honor, in this case both Mr. and Mrs. Reyher used violence in connection with the offense consistent with that definition. Consistent with that definition, violence can be individual as in the case of a one-on-one, head-to-head assault. It could also be collective, as we have here, where the defendants participated in a collective push against the police line, throwing their combined body weight against officers, causing one officer to scream in pain as he was smashed against a door frame, and enabling a dangerous situation where another officer was drugged into the crowd, beaten, tased, and came dangerously close to losing his life.

The officers in the tunnel that day described their experience as being something from a medieval battle.  Your Honor, that is violence.  The collective violence in the tunnel represented some of the most brutal violence on one of the darkest days in our democracy, and the provision of 4C1.1 did not envision that such collective violence would get a pass.

There could be no question that both Mr. and Mrs. Reyher engaged in collective violence.  They entered the tunnel not once, not twice, but, as Your Honor noted, three times, repeatedly joining their body weight with the crowd's to push against officers.

The reason that situation was so dangerous was because of the sheer mass of rioters that the defendants both joined on several separate occasions.  And what is even more remarkable is that the Reyhers witnessed Officer Fanone be dragged into the crowd, hit with a flagpole, tased, recoiling in pain as members of the crowd shouted to use his own gun against him.  And I know that we will address this more with the 3553(a) factors.

But, Arthur Reyher, in a moment of humanity, actually intervened to help Officer Fanone.  But then, after that, both Mr. and Mrs. Reyher went back to the mouth of the tunnel a fourth time where they kept enabling this collective assault, knowing full well --

THE COURT:  A fourth time?

MS. JASIEWICZ:  Yes, Your Honor.  They went to the mouth of the tunnel.  So they didn't enter the tunnel the fourth time, but they went back to the mouth of the tunnel and they kept enabling this collective assault, while knowing full well that the crowd was advocating for it and coming dangerously close to killing police officers.

THE COURT:  What did they do on that fourth occasion, other than be at the mouth?

MS. JASIEWICZ:  Your Honor, they were participating in the push.  Arthur Reyher also gestured to other rioters, encouraging rioters to come inside the tunnel.  And at the end of the day, Your Honor, the Reyhers spent more than an hour participating in this collective assault.  I understand it was only a few minutes at a time inside the tunnel, but they were there for more than an hour, pushing their body weight against officers, at times yelling "heave-ho."  And, Your Honor, I think that certainly qualifies as the use of physical force, accompanied by fury, vehemence, or outrage.

In addition, we know that they acted with intent to harm because both Mr. and Mrs. Reyher stated, when they stopped for an interview, that their intent was to push through the police line, to get inside the building.  They said they wanted to get where Congress was sitting.  Pushing through police officers' bodies to breach the United States Capitol is plainly acting with intent to harm those officers.  So for those

reasons, Your Honor, the 4C1.1 reduction should not apply in this case.

THE COURT: Let me ask this: As far as the sequence of events, the officer who -- I forget his name, who was being crushed in the door.

MS. JASIEWICZ: Yes, that was Officer Hodges.

THE COURT: When did that occur in reference to these four --

MS. JASIEWICZ: That occurred --

THE COURT: -- when defendants were at the mouth or inside?

MS. JASIEWICZ: Yes, Your Honor. That occurred when the defendants were in the tunnel for the third time, and they were positioned about six people back from that incident. And they both said that they heard that somebody was being crushed and they heard the screaming.

THE COURT: And Fanone was, again, which sequence?

MS. JASIEWICZ: So that was sort of after the third entry into the tunnel, but before the Reyhers returned to the mouth of the tunnel.

THE COURT: Thank you.

Any reply?

MS. MULLIN: Yes, Your Honor. With respect to Jessica Reyher, I would like to clarify two points. The point at which an officer was heard yelling, "I'm stuck, I'm stuck,"

she also said -- she was about six or seven people behind, she was ducked behind her husband, she said she heard that and she was saying, "Stop, stop." So she was trying to get people to stop. What she heard -- she heard someone saying that they were stuck. She did not know at the time -- she said this in her interview -- that the person was an officer.

With respect to the fourth time, the Reyhers were at the mouth of the tunnel. The video evidence does not support that Ms. Reyher was engaging in any pushing or any shouting or any directing anyone towards the tunnel. Again, she was there, sort of standing behind or next to her husband.

Your Honor, I don't think -- Ms. Reyher did admit, she was very candid that their intent was to protest the certification of the vote. She never said that she intended to injure an officer. And that's what the courts have found to be required for -- in order for 4C1.1 to not apply.

The government's argument about this collective violence is precisely the argument that was rejected by Judges Mehta, Bates, McFadden, and Chief Judge Boasberg. I mean, the idea that categorically no January 6 defendant qualifies for the adjustment flies in the face of the fundamental sentencing principle that sentencing should be individualized to the defendant and the defendant's conduct.

And Ms. Reyher does not dispute that January 6 was a horrible and terrible day and that she saw violence, that she

should have left, that it was a horrible day and she wishes she never went, but that does not mean that she does not qualify for this adjustment because her conduct did not evince an intent to injure, her conduct did not show credible threats of violence. And, again, this collective argument is precisely the argument that has been rejected by district court judges in this exact same scenario.

THE COURT: Counsel for Mr. Reyher, anything you want to say in regard to this issue?

MS. McGRADY: Your Honor, I join in the comments by Ms. Reyher's counsel. Just a few things to add. Although Mr. Reyher was in front of Ms. Reyher during their time inside the tunnel, Mr. Reyher also -- there's no evidence that he punched, kicked, hit, was throwing objects, was, you know, using a fire extinguisher. The evidence is that he had his hands up, that he said, "Don't hit them," that he was engaged in a collective push.

But as counsel has demonstrated, other district courts have rejected the argument that by virtue of their presence during the violence, that they should be excluded from the adjustment. And because violence or credible threats of violence hasn't been defined, a blanket approach, in terms of presence in the mob, would preclude everyone who was present at January 6 from --

THE COURT: It was more than just presence here. I

mean, there was aggressive conduct on the part of both defendants. They weren't just -- if they were just standing there and didn't engage in the push, I would agree, but there's more than just being there.

MS. McGRADY: Correct. They were engaged in the push, but during their debriefs they were clear about what their intent was. And it was also demonstrated by Mr. Reyher encouraging people not to harm law enforcement and stepping up when Officer Fanone was dragged into the crowd.

And I would like to clarify, from my review of the evidence, the way that the events transpired was the Reyhers were in the tunnel on three different occasions for, you know, less than 15 minutes total, then as Officer Fanone was dragged into the crowd, Mr. -- as Officer Fanone was dragged into the crowd, Mr. Reyher intervened and then the -- we're at the mouth of the tunnel for a while afterwards, but they were not engaged in pushing. They were simply engaged in chanting afterwards and then they left.

THE COURT: Well, I don't know all of the facts that were before my colleagues in their assessment as to whether what occurred in those cases amounted to violence or the threat of violence and whether that precludes application of this new guideline, but it does seem to me that if you are cognizant of the fact that the police are seeking to inhibit the movement of a crowd and you participate in that, obviously the only way

you're going to get past the police, since they are not permitting you to do so, the only way you're going to get by them is through violence. You can't, you know, it seems to me, take the position I did not intend to engage in violence when the objective of trying to get to where you wanted to go would necessitate the use of violence to accomplish that objective.

So, again, I don't know all the facts regarding what were before my colleagues, but it seems to me here, where you've got three occasions where individuals -- and the evidence, according to what the government represents, is that they were both engaged in pushing to try and force entry into the United States Capitol, and I would have to conclude that when you associate yourself with people who are engaged in violence and you contribute to that violence, that you in fact are violent also.

So I would have to conclude -- maybe the Court of Appeals will see it differently -- that here, when you've got three separate encounters of force against police for the objective of trying to gain entry into a building and the only way you can do that is through violently breaching the police line, I would have to conclude that they, in fact, did engage in violence, or at least the threat of violence. And accordingly, I would have to conclude that they are not entitled to the two-point reduction. But the objection is noted for the record.

Okay.  There are no other objections that I could see that were raised by the defense, so I would conclude that having made that ruling, that the presentence investigation report and the guideline calculations are accurate.

Government counsel, any allocution?

MS. JASIEWICZ:  Your Honor, there is one more issue related to the guidelines calculation that I wanted to touch on briefly before my colleague, Ms. Bolas, handles the allocution.

THE COURT:  I didn't see that objection.

MS. JASIEWICZ:  It's not stated as an objection to the presentence report.  But there is an issue, Your Honor, that Ms. -- Mrs. Reyher's counsel has raised with regard to the three-point enhancement for an offense involving physical contact.  And I understand that defense counsel has packaged this issue as a request for a downward variance, so that fits with the 3553(a) factors.  But the government believes that it's important to address this issue with respect to the guidelines calculation, because the practical effect of applying the three-point enhancement under Section 2A2.4(b)(1) and then varying downward to compensate for that enhancement would be to undo or partially undo the agreements by which Mrs. Reyher is gaining acceptance of responsibility points.

So, Your Honor, we have a plea agreement here.  The government would not have agreed to the two-point reduction for acceptance of responsibility without that three-point

enhancement for physical contact.

I understand that defense counsel is saying that that enhancement should apply, but, at the same time, defense counsel argues that that enhancement overstates the nature of Mrs. Reyher's conduct on that day.

THE COURT: Are you suggesting that the position they're taking in that regard abdicates the plea agreement?

MS. JASIEWICZ: Your Honor, I'm suggesting that it is disingenuous for defense counsel to argue that this Court should vary downward to compensate for that three-point adjustment. Mrs. Reyher has agreed that the three-point adjustment should apply. And what's more, Mrs. Reyher agreed to a statement of offense pursuant to which she agrees that if the government would go to trial, it would prove beyond a reasonable doubt that she, among other language, used her body weight to push in unison with the rioters against police officers.

THE COURT: I have the plea agreement, but I don't have with it the statement of offense. Do you have a copy that I can see?

MS. JASIEWICZ: Yes, Your Honor, I do. May I approach?

So, Your Honor, the references --

THE COURT: One moment. One moment.

MS. JASIEWICZ: Sure.

(Pause.)

THE COURT:  Okay.

MS. JASIEWICZ:  Your Honor, there are several references in that statement of offense to physical contact. Several references to physical contact between Mrs. Reyher and police officers.  So, for instance, in paragraph 8 she agrees that she joined a group of rioters who attempted to violently push their way past law enforcement officers guarding the tunnel.  Paragraph 10, she agrees that she quickly pushed her way to the front of the pack of rioters, where she attempted to push past the officer in the tunnel.  Again, in paragraph 14, she used her body weight to push in unison with the rioters against police officers.

As defense counsel acknowledges physical contact, as that term is used in Section 2A2.4(b)(1), encompasses a range of conduct.  And we simply wanted to state on the record, in the guidelines context, that because Mrs. Reyher has agreed that her conduct involved physical contact, that three-point addition should apply and the Court should also not vary downward to compensate for that addition.

THE COURT:  Before I hear further allocution from the government, anything from the defense in reference to that?

MS. MULLIN:  Yes, Your Honor.

THE COURT:  I assume you're not arguing that -- at least from what government counsel said -- maybe she's

misstating the situation -- that you're not arguing that the three-point addition is not appropriate pursuant to the plea agreement, but you're arguing that based upon the circumstances here, a variance should be considered based upon that factor?

MS. MULLIN:  Exactly, Your Honor.  I addressed that in my response to the government's memorandum.  We agree and stand by the fact that the three-level enhancement applies.  We are simply making an argument that is routinely made all -- you know, in cases in which the defense is permitted to ask for a variance sentence, which we are here, and that is that the three levels overstates Ms. Reyher's culpability because she did not have direct physical contact with an officer.  That's simply the argument we made.

I, frankly, think that it's -- to use the government's word, disingenuous of them to suggest, without stating explicitly, because I know it's not true, that we're reneging on the plea agreement.  This is an argument routinely made in this court and other federal courts where the defense is permitted to request a variant sentence.

So the argument was, yes, it applies, we agreed it applies, but in this context it overstates her culpability because of her conduct as a whole, and that her conduct as a whole, the nature and circumstances of her offense, merit a downward variance, in addition to the other factors set forth in my memorandum.

THE COURT:  Very well.  I think it's an appropriate argument to make, even though the enhancement applies, that under the circumstances, the extent of the contact is not sufficient reason not to vary downward.  So I think it's an appropriate argument.

Government, further allocution?

MS. BOLAS:  Yes, Your Honor.

As Your Honor is well aware, January 6, 2021, began as a peaceful protest at the Ellipse and turned into a violent attack on the United States Capitol.  A mob of rioters descended onto the Capitol as electors were certifying the 2020 election.  As a result of the violence, over 100 officers were injured.  The Reyhers were part of that mob on January 6th.

They went to the U.S. Capitol and, like most rioters, entered on the west front.  At the point of their entrance, the Reyhers would have seen chaos.  Chemical irritants had been deployed, police were lining the west front, barricades had fallen, emergency warning systems were blaring.  Mr. Reyher, in fact, explained during his debrief with the FBI that he witnessed, at that point, rioters throwing bike racks at officers.  Even after witnessing all of that, they continued toward the Capitol, they continued toward the violence.

The Reyhers proceeded to what is commonly referred to as the tunnel.  This was the epicenter of violence on January 6th.  The tunnel is a narrow passageway in the center of the

U.S. Capitol, commonly known because the president-elect walks out of it on Inauguration Day. On January 6, rioters attempting to breach the Capitol targeted the tunnel. In order to prevent the mob from entering, officers barricaded their bodies in the closed space while rioters continuously assaulted them, most commonly with what we refer to as a heave-ho effort, where rioters would collectively back up and then use all of their weight to push forward. The Reyhers were part of that coordinated assault.

The Reyhers participated in the pushing effort, Your Honor, not once, not twice, not three times, but a total of four separate times. Three times from within the tunnel and once from the mouth.

In case it wasn't clear what the Reyhers intent was upon entering the tunnel, they came in shouting, "Whose house? Our house" and "USA." You can see the Reyhers chanting in this still image from CCTV captured on that day. Both admitted in their debriefs with the Federal Bureau of Investigation that the reason that they went into the tunnel and pushed against police officers is so that they could get inside the building.

They pushed forward to the front of the tunnel, near the police line, until Mr. Reyher, with Mrs. Reyher right behind him, was face-to-face with officers and he pushed directly into the line. Once they made it to the front, Your Honor, this is what it looked like from an officer's

perspective.

(Video played.)

Obviously, Your Honor, that video is extremely chaotic, so on this slide we have a still frame of that video to show you just how close the Reyhers were on that officers line.

Now we can also see this from another rioters' perspective.

(Video played.)

So as Your Honor can see, there's complete chaos inside the tunnel and the Reyhers are at the very front of it. Not only were the Reyhers actively engaged in the pushing at this time, but they saw violence toward officers. As you saw in the clips, another rioter had taken a fire extinguisher and sprayed it at officers who were forced to breathe it in in the close confines of that space. They also saw rioters passing police shields forward and assaulting officers at the front of the line with them.

Roughly seven minutes after the Reyhers entered the tunnel, while they were still at the front, the mob began those collective pushing efforts we were talking about, with one rioter using his hands to show one, two, three, and then push. The Reyhers were part of that.

A minute after the coordinated effort began, officers were able to force the rioters back, including the Reyhers.

But even inside the tunnel, after witnessing what they saw in the tunnel, they continued to encourage other rioters. Specifically, Mr. Reyher said, "Don't hit him. Keep your hands up and push," as can be seen in this next video.

(Video played.)

The Reyhers again entered the tunnel at 3:04 p.m., as Your Honor can see in this video, which does not have any sound.

(Video played.)

They again joined the mob's collective assault and used their body weight to physically push in unison with the other rioters and force their way through to the police officers who were protecting the building. And, Your Honor, I'll just put a circle (indicating).

A few seconds later, as they tried to push forward, the Reyhers covered their faces, likely experiencing the lingering effects of the chemical irritants that had been deployed in the tunnel.

THE COURT: One moment.

MS. BOLAS: Yes, Your Honor.

(Pause.)

(Off-the-record discussion between Courtroom Deputy and the Court.)

THE COURT: Okay. I do have an 11 o'clock criminal case I have to have a status hearing on. I need to do that.

So we'll break at 11 to do that, and then I have civil case at 11:30 and I'm just going to move that to a later time or another day. But I do need to do the 11, so I'll have to take a short break. That shouldn't take long. It's an initial appearance on another January 6 case.

MS. BOLAS: Would you like us to continue now, Your Honor?

THE COURT: You may proceed, yes.

MS. BOLAS: As you can see on this slide, during the second entry the Reyhers covered their faces as they continued to push forward, likely experiencing the lingering effects of chemical irritants in the air. This, again, gives the Court an idea of the chaotic scene that was the tunnel. Again, once the Reyhers were pushed out, Mr. Reyher continued to encourage violence. He coordinated efforts, yelling, "Push," as can be seen on this video.

(Video played.)

THE COURT: One moment.

(Off-the-record discussion between Court and Law Clerk.)

THE COURT: Okay.

MS. BOLAS: And again, Your Honor, in this video.

(Video played.)

The Reyhers entered the tunnel for a third time at roughly 3:12 p.m. and they again immediately joined the pushing

efforts.  It was during this push that Officer Hodges became stuck between a metal door and a riot shield being held by another rioter.  He became compressed and his body was trapped as the mob, including the Reyhers, pushed forward.  They were roughly six rioters back.

Another rioter was able to take advantage of this at this time and ripped off Officer Hodges' mask and hit him in the face with the police baton, all while he was being crushed by the collective weight of that crowd.  You can see this in this video, Your Honor.

(Video played.)

THE COURT:  Okay.  We'll take a short break so I can do this other matter.

MS. BOLAS:  Thank you, Your Honor.

(Recess from 11:00 a.m. to 11:13 a.m.)

THE COURT:  Go ahead.

MS. BOLAS:  Thank you, Your Honor.  Where we had ended, we had just watched the third entry.

And, Your Honor, this is a still frame from that video that we just watched, and it is almost at the exact same time.  You can see Officer Hodges on the left and the Reyhers on the right as part of that heave-ho effort.

Your Honor, as my colleague already alluded to in their debrief, the Reyhers admitted at one point they heard someone was being crushed or pinned and they wanted to stop and

asked the crowd to stop.  But that impulse, if true, was short-lived because shortly after they engaged in yet another push.

This is the fourth push, Your Honor.  The Reyhers joined the collective assault of rioters at 3:17 p.m.  Your Honor can see them at the top of the screen.

Again, along with the mob, they thrust back and forth against the police line.  The police were able to gain some ground roughly a minute later, however, Officer Fanone was dragged into the crowd where he was brutally assaulted, including being tased.  While Officer Fanone was among the rioters, the Reyhers both heard individuals threatening to use Officer Fanone's own weapon to kill him.

In a moment of humanity, Arthur Reyher put up his arm to shield another rioter attempting to attack the officer.  He and other rioters facilitated Officer Fanone's return to the tunnel where he collapsed unconscious.  According to Mr. Reyher, it was after this incident that he realized the gravity of the situation and chose to leave.  But that's not true.

Even hearing rioters threaten the death of a police officer was not enough.  They went back to the tunnel again.  After having witnessed Officer Fanone get assaulted, the Reyhers again joined rioters at the mouth of the tunnel where Arthur Reyher -- whose hand is circled here -- continued to wave rioters in and pass the bullhorn to a rioter in front of

the police line.

Your Honor, the government is recommending a sentence of 12 months incarceration for Mr. Reyher and nine months incarceration for Mrs. Reyher.  The terms of incarceration are within the middle and low range of the sentencing guidelines, respectively.  The government believes that Arthur Reyher's conduct was more aggravating because he entered the tunnel first, he pushed further in, he directed rioters and encouraged them to push.

Both defendants here ask for significant downward variances to the guidelines and I would like to address a few of those now.

To begin with, Your Honor, to the extent there are mitigating considerations, the government has taken those into account in its sentencing recommendation.  For instance, as discussed, the government believes that Arthur Reyher's conduct was more aggravating and has, thus, recommended a higher sentence.  However, Mr. Reyher's conduct does not justify Mrs. Reyher's conduct.

Mrs. Reyher's argues in her sentencing memo, in her reply memo, that she was just following her husband's lead. This is simply untrue.  It was Mrs. Reyher who went into the tunnel.  She expressed her intentions by chanting.  She, in fact, told the FBI that she entered the tunnel because she wanted her voice to be heard.  And ultimately she pushed police

officers for the express intention of entering the building.

Your Honor is aware from the recent *Grace* case that he sentenced, that individuals who arrived together, even married couples separated, that Jessica Reyher is attempting to shoulder the responsibility solely on her husband and fails to take accountability of her own actions in fact weighs in favor of a sentence -- of a guidelines recommendation because of specific deterrence.

Jessica Reyher also argues for a lower sentence based on what she characterizes as genuine and unequivocal remorse. In order to aver Ms. Reyher's remorse, the government would point the Court to her apology letter, which I believe is Exhibit 2 to her sentencing memo. The letter, which is a total of half a page, double-spaced, is lacking in any sort of sincere remorse.

She does not apologize for being part of a violent riot. She does not apologize for pushing officers. She does not apologize for being in part of the most violent place on the Capitol on January 6th. Instead, she apologizes for -- and I'm quoting, Your Honor -- "Being part of a crowd that made it hard for police officers to protect the Capitol."

Mrs. Reyher also explains that her perspective comes from being labeled a traitor and having her life threatened, not from reflecting on her crimes or realizing any sort of sincere remorse. The government does not believe that that

should be counted in her favor. While it may be true that Jessica Reyher is sorry for her actions based on the consequences, the government has taken into account her statements in our recommendation and still recommends a guideline sentence.

Similarly, Your Honor, Arthur Reyher has brought up the fact that he helped officers on January 6 as a reason to vary downward from the sentencing guidelines. I expect that much of the colloquy for the defense will be focused on this. He has specifically mentioned incidents where he put himself between rioters when rioters were using bike racks against officers, hitting a flagpole into the air so that it couldn't be used against officers, and that he assisted Officer Fanone. The government is only aware of the last incident being on video and we have taken it into account in our sentencing recommendation.

To Arthur Reyher's credit, he did exercise a moment of humanity in protecting Officer Fanone and we certainly have taken that into account. But this is not a reason to vary downward from the sentencing guidelines. Mr. Reyher was a direct contributor to the violence on January 6th that almost claimed Officer Fanone's life. It was, in part, his pushing efforts that forced Officer Fanone out of the tunnel and into his perilous position. That he witnessed all of this conduct, including the assault of Officer Fanone, and still decided to

go back to the mouth of the tunnel where he waved in rioters is in itself an aggravating factor.

The Court should also be inherently suspicious of the Reyhers' contention that they were helping officers.  In their debriefings with the FBI both defendants repeatedly stated that they were there to help officers, that Arthur Reyher was making sure that they weren't getting hit and that they were assisting officers by redirecting weapons.

Your Honor, these after-the-fact excuses are entirely inconsistent with their actions, especially the fact that they went back to the tunnel four separate times.  People who are trying to help police officers do not enter tightly cordoned spaces, move back and forth with 50 others, violently bashing their bodies, shields, and weapons into police officers.

People who are trying to help police officers do not encourage rioters wearing tactical gear and carrying weapons to push police.  People who are trying to help police officers do not ignore police commands to back up.  They don't get as close as they can to police officers when it's readily obvious that those officers are trying to move them back.

What makes the argument more specious, Your Honor, is that after January 6 Mr. Reyher went on social media and continued to blame officers for the riot.  And the government would submit that if this is the arguments the defendants make here today, the Court should seriously consider whether to give

these defendants credit for acceptance of responsibility.

Your Honor, the conduct of these defendants warrants a guideline sentence, plain and simple.

The tunnel was the most violent area on January 6. Numerous officers were injured in the tunnel after fighting for hours against relentless attacks of rioters, and these defendants were relentless, persistent and unabating.  They did not stop.  They did everything they could on four separate instances.  They used their body, they used their voices, they used the strength of the mob.  They wanted to get inside the Capitol and officers were not standing in their way.

The violent conduct that these defendants participated in was not singular in nature.  They did not enter the tunnel and realize the gravity of the situation and then realize they were wrong and leave.  In fact, as we've discussed, Your Honor, we're not sure they realized the violence that their -- the violent-actions consequences at this point in time either.  The violence against police officers should not be tolerated and it should certainly not be tolerated for political gain.  These defendants should be sentenced in accordance with the seriousness of their actions. Thank you.

THE COURT:  You said that Mr. Reyher did something on social media after the event.  What are you specifically referencing?

MS. BOLAS:  Your Honor, I believe there was -- it was a Facebook post.  I think it might be in our sentencing memo.  But within his social media there were posts related to the officers' conduct on January 6th, and reference that they were in fact the cause or part of the cause of the riot.

And, Your Honor, we would be happy to provide those for the Court, if you would like them.

THE COURT:  I'll give you a chance to respond, so if you can find that and point that out.  I did -- I read your memo, but I don't recall that.

MS. BOLAS:  Yes, Your Honor.  It's on page 31 of the memo, bottom paragraph.

THE COURT:  Okay.  Thank you.

I'll hear from either defense counsel.

MS. MULLIN:  Your Honor, first, I would briefly respond to two points the government raises because I believe the government mischaracterizes my argument and Ms. Reyher's expressions of remorse.

I did not argue in my memo that Ms. Reyher was just following her husband around.  Ms. Reyher admitted in a statement of offense that she was there to protest peacefully, intending to protest peacefully what she then believed to be election fraud.  She admitted in her statement of offense that she and Mr. Reyher were part of the crowd in the tunnel that were pushing forward, although she was not at the direct front

of the crowd, nor did she physically have direct contact with an officer.

But the video evidence does show that for the most part she is sort of ducking behind Mr. Reyher, both in the tunnel and outside the tunnel. The video evidence shows that she did not yell, push, that she did not direct anyone towards the tunnel, that she did not coordinate any of the pushes. So I think that's important to point out.

The government has acknowledged that her conduct was less culpable than Mr. Reyher in its sentencing request. But I do think it's important to point out that for the most part she's sort of ducking behind him. She said repeatedly in her voluntary debrief, yes, we admit that she was there, she was intending to protest the certification of the vote, but that when she realized it was time to leave, she didn't want to get separated from her husband. And I think that's important for the Court to consider in assessing a sentence for Ms. Reyher.

With respect to her expression of remorse, Your Honor, she has unequivocally stated that she was sorry that she was there, she was sorry she was part of a terrible day, that she was sorry that her presence in the crowd impeded the officers' ability to do their jobs. And she has said that she's sorry to our country.

In fact, unlike many defendants, including January 6 defendants, she has said she's sorry because of the harm caused

others and not the consequences that have befallen her.  And as her lawyer, I would point out that the Reyhers have experienced significant collateral consequences for their conduct.  They now have a felony conviction, their business was harmed.  They lost financial resources because their business was doxed online.

So she has expressed that she is not sorry because of those consequences, but she is sorry because of what happened to police officers that day and because of her role in it.  So I think that's important to emphasize, Your Honor.

With respect to the -- her history and characteristics, Your Honor, here we have -- first of all, I would like to acknowledge that everyone here in the audience is a member of the Reyhers family; there are brothers-in-laws, sisters-in-laws, cousins.  I had an opportunity to meet many of them when I went to visit Ms. Reyher in Indiana, and they all came here from Indiana to show their support for the Reyher family.

Ms. Reyher is a mother of four.  She is someone who has never had any contact with the criminal legal system. She's overcome significant trauma in her only life to become a model mother to her own children, the youngest of whom is 12. While she mostly stays at home, taking care of the children and homeschooling them since the pandemic, she also helps Arthur with his various businesses.

She is the primary caretaker for the children.  She is a primary caretaker to her elderly mother who lives at home with them and who was recently hospitalized.  She has recently learned that her mother has to be on oxygen.  And she tends to all of her mother's needs, including taking her to the doctor and picking up her prescriptions and feeding her and all of the things that attend to caring for an elderly parent.

Again, just with respect to the nature and circumstances of the offense, I know I've covered this, but she should have left.  She has acknowledged that.  But I would just point out again that she did not physically assault an officer, she didn't yell any taunts, she didn't evince what I would characterize as an intent to injure any officer.

What she admitted in her debrief is around the time of January 6th she believed the lies that were being spread about election fraud.  And, you know, while we can look back and say how could you believe that, you know, this is a time when the president of the United States and other elected leaders were telling the people that there had been election fraud.  And she looks at it now and says yes, I should have looked at that with a grain of salt.  But we've got, you know, frankly, the president and other prominent Republican leaders telling people that there was election fraud.  She is not even a Trump supporter, but she believed, ironically, in the idea of a free and fair election.

So she came to the Capitol to express, as Americans should, her concern that there had been election fraud.  And again, on this point, you know, she's got a high school education, she's a mother of four, busy mother of four, she's seeing on the news and from the president of the United States that there was election fraud.

She now knows that she should look at reports like that with skepticism.  But we still have, you know, a third of the American public, sadly, still believes that there was election fraud.  We still have elected members, including the Speaker of the House, who believes that there was election fraud, or who won't admit that Biden was the duly elected president.

So, you know, how can we blame this mother of four from Indiana for believing what the elected leaders were telling her?  She came to travel to D.C. with her husband to peacefully protest what she then believed to be election fraud.  Of course, once they got there, she has admitted and expressed nothing but shame and regret for crossing a line once they got there.  But that was their intent and that was her intent.  And she has been and she will be punished for crossing that line and for not leaving as soon as they knew they should have.

I doubt that -- in the days leading up to January 6 and after January 6 Ms. Reyher didn't post anything online, she didn't send any private messages to friends boasting about or

proclaiming, you know, what she and Arthur did.  She immediately recognized that they were in trouble and that she was wrong.

Your Honor, with respect to comparison cases, the government strains to compare Ms. Reyher's case to other cases. And first I would bring up the case of Brian Preller.  In that case the government says, well, Ms. Reyher is like Brian Preller, so she should get a sentence like Mr. Preller. Mr. Preller was part of an extremist organization.  He, too, was in the tunnel, engaging in the heave-ho.  He had a helmet and was armed with a technical vest and chemical spray.  And even though he engaged in all of that conduct in the tunnel, he was given a sentence of not incarceration, but he was given a sentence of probation, with significant conditions, which we concede would be applicable here.

And, so, the government realizes and had to correct itself and then the government says, well, actually, Ms. Reyher is like defendant Hess.  But I would point out -- and this was in the government's filing yesterday, what we have with defendant Hess, who received a period of incarceration, the government acknowledges that he physically pushed an officer in order to get inside the building and sent messages bragging that he was brawling outside the door of the Capitol building before he went in.

And later that defendant sent messages to friends.

After boasting about what he did, later that defendant sent messages to friends saying:  Don't tell anyone I was there; let's cover this up; don't tell anyone I was there.

So there are salient and significant contrasts between Mr. Hess's case and Ms. Reyher's case.  Of course, Ms. Reyher did not physically push her way into the building, she did not physically touch an officer, she did not boast about anything she or Mr. Reyher did, and she didn't later try to cover up her tracks.

So, like Mr. Preller, we believe a probationary sentence with conditions is appropriate for Ms. Reyher.  And such a sentence would avoid an unwarranted disparity with more culpable defendants also convicted under Section 231.

Such a sentence, Your Honor -- and just being here in federal Court, she's never been in a courthouse before -- is sufficient to deter her from ever engaging in such conduct again.  And I think that is just clear through her compliance on pretrial supervision, the statements she made in her voluntary debrief with the FBI, and her immediate acceptance of responsibility.

With respect to general deterrence, taking this woman, who has little financial means, away from her four children isn't going to deter anyone else in this situation, especially when the leader of the rally is on track to become the next Republication nominee for President and so far has not

suffered any of the consequences for organizing such a rally and spreading the lies that brought people to Washington, D.C. on that day.

Probation and a felony conviction is a just punishment for Ms. Reyher.  No more is needed to punish her. She's already been punished in so many ways.  I mean, just the last year of anguish, you know, wondering will I not see my kids?  What will happen to my kids if I'm gone?  And she has just been in anguish.  I think that in and of itself is a punishment, the threat of prison.  It will continue to be a punishment if the Court places her on supervision with conditions because she knows that if she so much as screws up a condition -- which she won't -- she can go to prison.

Finally, Your Honor, a sentence that fairly reflects the mitigating circumstances of this case will promote respect for the law.

So for all those reasons, Your Honor, we would request that the Court vary downward.  If the Court varies downward one level, the applicable guideline range would be six to twelve months.  If the Court varies downward two levels, it would be four to ten months.  And under both those categories probation is warranted under the federal sentencing guidelines.

MS. McGRADY:  Your Honor, first, let me say that Mr. Reyher does intend to address the Court after I close with my comments, and he can tell you sort of how this case has

impacted him and how his thinking has evolved since he was charged.

But, nothing good happened in the tunnel and so to argue the nuts and bolts of whether Mr. Reyher put his hands up or whether he pushed, he made a gave judgment in error by even being in the tunnel that day and he knows that.

You know, yes, he did display humanity with Officer Fanone. And I don't think that he went there intending to cause any violence. During his debrief he tried to explain what happens when you're confronted with a mob. And the way that he tried to explain it was, you know, when you're in high school and you see a fight break out and you sort of thrust yourself into the middle of it. And it doesn't make any sense, but in his mind, you know, he was going to get into the middle of it to prevent bad things from happening. And we know that that is a thinking error.

But we also, you know, never -- you know, people say I know I would make a great eyewitness, and then there are studies that most people make horrible eyewitnesses. And you just don't know how you'll react when confronted with that situation. So, for Mr. Reyher, he entered the fray and that was the wrong decision. But he also is not sophisticated with respect to politics.

During his debrief he said they were trying to get Congress to investigate all the election fraud issues and he

really didn't know about the decertification process when he went to the Capitol. And he talked about what he tried to do to prevent violence. But I think today the focus for Mr. Reyher and for Ms. Reyher should be on who they were -- who they are as people, not in just this one moment in time. And we have, you know, 20-plus people who traveled with them from Indiana to support them because they are good community members, they are good family members, they are good parents. And, you know, they're devoted to taking care of one another and their families.

Mr. Reyher is not a keeper of warrior. The government insinuates that he's, you know, posted lots on social media, when all they could come up with was a reTweet. So, you know, he's not someone who has continued to espouse these beliefs, you know, years after the conduct took place.

What you have is someone who helped Officer Fanone, who said, "Keep your hands up," and "Push," who said, "Don't hit them." But, without a doubt, got caught up in a situation that he now regrets.

And in terms of parity arguments, you know, counsel for Ms. Reyher -- Mrs. Reyher has pointed out to cases where defendants with similar conduct have received sentences of probation. Mr. Reyher would gladly accept a sentence of home confinement or community service, any other sentence in lieu of incarceration, primarily because he is the breadwinner of his

family.  He takes care of a lot of people, not just his wife and children.

And, you know, I think to say that Mr. Reyher directed other rioters would be a stretch.  I think he was there and he was chanting.  There's no evidence that he destroyed property.  There's no evidence that he coordinated with anyone or that this was a plan with any other group of individuals before he and his wife decided to go to the Capitol.

And I will -- I will let -- would you like Mr. Reyher to come to the podium?

THE COURT:  If he wants to speak, yes.

MS. MULLIN:  Your Honor, I'm sorry I didn't mention this:  There are two individuals here who would like to address the Court from the many people that have attended sentencing hearing for the Reyhers.  Would the Court hear from them now and then Mr. and Mrs. Reyher?

THE COURT:  However you want to do it.

MS. HUNT:  Good morning, Judge.  My name is Sarah Hunt.  Arthur is my brother and Jessie is my sister-in-law.  I stand here today to ask you for leniency for them both.  I will reiterate what I have stated in my character letter and also explain why leniency is so important in this case.

Arthur is such a caring and helpful individual.  The businesses he has built are a reflection of his caring and

hard-working nature.  Every single person you see sitting here has benefited from my bother's kindness, whether it was him loaning one of us money, patching a hole in the wall, remodeling a beautiful kitchen, fixing a car, helping buy or sell a home, showing up to every one of our kid's birthday parties and making sure that were no leftover cake.

As a real estate agent he has helped many families through one of the most stressful yet happy times of their lives.  He is the sole provider of his household.  In his household there is not only just him, his wife, and children, there are many others that depend on my brother to provide.

His very ill mother-in-law lives there.  She is on oxygen and was put on a lung transplant list.  His wife's cousin and two boys are staying there.  They have horses, chickens, dogs, cats that depend on him to be fed and taken to the vet.  If Arthur is given any amount of time in prison, so many people and animals will suffer and be affected by his absence.  It is almost certain that the will lose their home and so many would be displaced.

While Arthur works hard to provide, Jessie is at home making sure everything is taken care of, from setting up showings and estimates, returning emails, invoicing and paying bills, ensuring the farm animals are fed and stalls are cleaned.  She is there to homeschool the kids.  She is being a mother figure to her cousin's two boys as well.  She is helping

her mother back and forth to doctors' appointments and hospital visits.  Jessie is there every day, loving and caring for everyone.

Jessie has never been in trouble a day in her life.  Her children's behavior is a reflection of her wonderful heart and excellent parenting.  Any prison time for Jessie would bring -- be doing so many a disservice.  Her children will likely be thrown back into public schools.  After their parents' sentencing, will surely be plastered all over the local news.  The hate they have received online already shows they will have to suffer once they go back to school, and my heart breaks for them.

Arthur and Jessie have experienced consequences for their actions.  Arthur has lost so much business because of the news.  They have suffered through so much hate, inblowing on the internet, including awful things said about their children.  These two wonderful human beings made one horrible decision at a time the entire world was under a lot of stress, heightened emotions and uncertainty due to the pandemic.

Arthur and Jessie are far from violent criminals.  It is crazy that I'm even saying this sentence.  They are very remorseful for being there and staying once the crowd got too much.

Please see us sitting here today and know that every single one of use care for them and any amount of prison time

will be like sentencing us all and we will suffer with them. My mother and father will have to take care of their grandchildren at 60 years old, and I know they will try to support them financially as well at a time when they are so close to retirement -- may mean many more years of work to earn back the money they spend trying to save my brother's home while he's away.

Please consider probation or home detention so that my bother can continue to support her family and Jessie can continue schooling the children and taking care of her mother. Thank you.

MR. WARD:  Good afternoon, Your Honor.  My name is Eddie Ward, I'm a cousin of Adams.  I'm probably one of the oldest in the family.  Adam's mother, Tanya, is here today with her husband Steve.  And being the oldest in the family, our grandfather kind of taught us that we take care of people.  Our grandfather was a carpenter, his father was -- worked on the railroads.  And when our grandfather passed, or even before that, you know, Adam's mom -- there were times that I slept on her floor, slept on her couch.  Now I'm a small-town attorney in Indiana.

But, Adam has kind of taken up that mantle, Adam and Jessie.  You know, they've got -- every year my aunt Tanya and Steve would have family get-togethers just before Christmas, after Christmas.  We would go to indoor water parks for all the

little kids.  And every year I think Adam and Jessie would have a different stray kid that they've brought in, you know.  And obviously we have a large family, but there would always be new people.

Currently, one kid in particular, Steven, who has been with them for four or five years now, he's at the house taking care of the annals, taking care of Jessie's sick mother who is on oxygen.  These are the people that when you get a flat tire, will pull over and help fix your tire.

Also, being older, when Adam was in junior high, ninth grade, I was an assistant coach on his football team.  I'm not sure if you're familiar with Indianapolis, but if you grew up off of 16th Street, near the track, relatively poor school area.  And I remember -- just to give you an idea how poor the schools were, there were kids who would pop out ear pads to share an ear pad or a hip pad with another kid.  Second year I coached most of the team flunked off the freshman team except four kids, so they just bumped them up to JV.

This is the environment that these guys grew up in and now they've moved to the suburbs.  They've been doing okay for themselves and they take people in and help people.  You know, I would hope that the Court would take that into consideration, that this is the type of people that they really are, and not necessarily this one event.

Again, I just can't reiterate enough that these are

the people that, again, if they saw you on the side of the road, they would come help change your tire or fix your car. If you called them and said, hey, I've got a problem, they would be there to help.  I know that they've helped financially with other members in the family.  I know they help with mechanic repairs and things along those lines.

We come from a -- more of a blue-collar background. It -- you know, our -- Adam's stepfather, Steve, he's worked for CarX for 35 years.  You know, these are service people.

So, I would hope that despite the great job that attorneys have done on both sides, that the Court will look at who they are outside of this one mistake.  And again, I can't reiterate enough that, you know, they -- Adam and Jessie's mother lives with them, she's on home oxygen.  He's got other kids that live with him, they're there now taking care of the animals and Jessie's mother.

These are just the types of people they are.  And I think that with any sort of jail time, being away from the kids, being away from the strays, and mother-in-law, that there's a lot more harm that will be done than good.

I thank the Court for allowing me to come up and speak today.

DEFENDANT ARTHUR REYHER:  Thank you for allowing me to speak.  I'm speaking with you today to at least state my motivations and actions that led to my current situation.  I am

completely regretful for my actions on the Capitol January 6, 2021, not because of the repercussions of those actions, but because of the harm they caused the officers that day and to so many others ever since. Those actions -- excuse me -- those same actions now threaten the place my children call home and the income that provides them with food. This thought torments me night and day, continuously gnawing in the back of my mind.

When swept up in the moment, I made terrible decisions that I now look back on and am unable to understand how I do not -- did not realize in that moment that those actions were contributing to the violence that I deeply wanted avoided.

We were outspoken critics of Donald Trump leading up to the 2020 election. In 2020 we voted third-party, and if legally able to vote again in 2024, we will do the same. Our attendance was not in support of him in any way or an attempt to overturn election. We wanted to peacefully protest what we perceived to be bipartisan fraud in our elections, that we firmly believed both parties have been engaged in for a very long time.

We honestly hoped that there may be a real push to expose this fraud and it may lead to truly free and fair elections. We hoped that our attendance would demonstrate that there is a large portion of Americans from all political backgrounds who share in this desire.

We were appalled at the actions of those who were striking, macing, and hurling objects at police.  And it brings us great shame to have participated in any manner with something so grotesque.

As for my wife, I strongly regret bringing her with me.  She is a very gentle soul who loathes conflict and would have never been anywhere near the Capitol if not for my invitation.  She certainly would not have moved towards what was happening at the Capitol building, had she not been in such a strange place, very far from home, in an extremely large crowd, and only attempting to stay near me, as not to become lost and/or harmed.

I will gladly accept full responsibility and the full repercussions for us both, as the thought of her being separated from our children is unbearable.  She has always been an outstanding mother, a wonderful wife, and a model citizen, not so much as having ever been being sent to the principal.

I greatly appreciate your consideration of my words here today and I completely respect whatever decision you arrive at in regards to my punishment.  Thank you.

THE COURT:  So the difficulty is that you can't tell me that you did not see in your first, or a least second entry into the tunnel what was taking place and that police officers were being assaulted.  But that wasn't a sufficient reason for you to turn around and walk away.

DEFENDANT ARTHUR REYHER:  I can't look back and understand what I was thinking, to be honest.

THE COURT:  I mean, the problem is a very difficult problem because, you know, our image in the world community has been diminished.  I was just over in Africa teaching, this summer, judges.  And our image as a nation has been diminished.  People don't understand how America, this purported shining light on the hill, found itself in that situation.  And, you know, the big problem is that what happened that day set a precedent for how you respond to an election that you don't agree with.

So what's going to happen in November?  You know, will the Democrats, if they lose, say, well, the Republicans didn't take it, so we're going to respond in kind?  I mean, the same rhetoric that caused what happened to occur on January 6th is happening again by the same perpetrators of the fraud.  And I would assume that there will not be an acceptance of the vote, regardless of what that vote is, and we may well experience another event like we experienced on January 6th because we're such a divided nation.  And we've now accepted this perspective that it's all right to engage in violence if you don't get the result that you want.

That's a troubling situation for the future of our country as a democracy.  And it makes it very difficult, sitting where I sit and seeing these cases constantly come into

me, because people are still being identified and arrested and charged. You know, it's hard because what do you do? I mean, you give somebody a slap on the wrist and say it's probation, next time around, why wouldn't people say, Well, you know, those folk did what they did and there were no consequences, really, so why not do it again?

And, you know, you're fortunate because, you know -- I don't know how many police officers, three or four, some of them were in that tunnel, because of the violence that they experienced committed suicide. So those children of those people don't have them anymore. Several officers have had to retire because of the injuries that they suffered. They don't have jobs anymore.

So, you know, it's -- but, I'll decide. I haven't made a decision as to what I'm going to do. But, thank you.

DEFENDANT ARTHUR REYHER: Thank you, Your Honor.

DEFENDANT JESSICA REYHER: Hello, Your Honor. My name is Jessica Reyher and I apologize formally to the police officers and my country for being part of the crowd on January 6 that made it hard for police officers to protect the Capitol.

I wasn't there for Trump. I did not even vote for him. I believed then that there had been election fraud and I just wanted our voices heard for the fair election. I came to D.C. thinking it would be peaceful protest. I never intended to hurt anyone. I realize now that I believed reports of

election fraud and I should have questioned it more. But even if there was election fraud, we should not have done what we did.

I went too far and, looking back, I would have done things differently and never been part of that devastating day. To be labeled a traitor and to have my life threatened from complete strangers puts things into perspective. The emotions were high that day and I got cut up in the atmosphere around me. This is in no way excuse or justification for my actions and I do take full responsibility and I hope that you can trust I will never be a part of a day like that again. Thank you.

THE COURT: What -- again, what I find very troubling is that, you know, you say you didn't come to engage in violence. I have no reason to believe that that's not true. But then when you go into the tunnel the first time, you have to see violence. Do you turn and walk away and say I'm getting out of here, I don't want to have a part of this? No. You go back in. You have to see violence again. Do you leave then and say no, let me get away from this? No. You go back in.

I mean, I don't know what was going on in the minds of people that day. It's crazy. And it's really hurt our country. And our future as a country is, I believe, you know, on shaky ground. And that day and people who contributed to that day have created this environment in a great nation, country that I love, that's been good to me, because I came

from very humble beginnings.  And to be able to be where I am now, I think there are very few places in the world where that could happen.  But it did.  But I fear that that's not going to be available maybe in the future for our young people.  And, you know, you contributed to that environment.

I hear your arguments that your lawyers have, you know, made.  It's, you know, admirable, but, you know, when you participate and put yourself in a situation where you're involved with a mob, you never know what those people are going to do.  And the reality is that I don't know what you all's intentions were, but there were some people there who I don't doubt that if they had been able to get into that Capitol and get to those congressional members or the vice president, they would have killed them.  And the environment of the mob created that environment.

Well, you know, deciding -- you all can have a seat. But, deciding what the appropriate sentence is is, obviously, very difficult because on the one hand I can't say that you all haven't been, you know, decent human beings who have contributed to your community and who have contributed to the country, and you appear to be good parents.  And that's the hard thing that I don't understand, being a parent myself, how you could put yourself in a situation where you put in jeopardy your own children.

Because, you know, when you put yourself in a

situation like that -- I mean, you all are really lucky that the cop -- that the police officers were constrained, because there was one person who was in fact shot and killed, legitimately, because she was coming through a window and there were congressional members in close proximity to where that occurred, and that person was shot and killed.  And you all are lucky that the police, for fear for their life, did not take out their weapons and start shooting people.

So if you would have got shot, you know, then what happens to your kids?  But you didn't think about that.  And again, you know, America recognizes the right of people to speak out and to protest, that's why we have the First Amendment.  And, unfortunately, throughout the history of this country there have always been certain level of issues related to the vote and electoral process.

I mean, my ancestors couldn't vote just because of the way they looked.  They didn't rise up and engage in violence.  They protested, and they protested peacefully so that they would be able and those who would come after them would be able to participate in the electoral process, and that was a good thing.

And, you know, if you had just come to Washington, even though your perception was totally misguided -- but I guess if you're getting, you know, so-called leaders telling you something, and you got these news stations that are telling

you something, regardless of how bogus and false it is, I guess if that's what you're buying into, you accept it.

You know, but you had a right, regardless of what reason it was, to come to Washington and protest. That's what America is supposed to be all about. But, you know, once you all saw what was taking place at the Capitol, not only once you got to the tunnel but before you got to the tunnel, that you saw this violence taking place, you know, you should have turned and walked away and said, hey, I came here to just protest, I'm not here to see police officers getting beaten. And like I said, you know, regardless of what your intent was, the reality is that there are family members who don't have their police officer family member anymore available to them because they're dead.

Several of them were just so traumatized by what took place, I think it was three or four committed suicide. Officer Fanone had to retire because of the heart attack he suffered as a result of what happened to him. There are several other officers who I've, you know, heard who have said, you know, that they can't work anymore because of the injuries that they sustained that day. And the fact that you all participated in that group activity, regardless of what your intent was, contributed to what happened to those officers and what happened to the image of this country.

And there are a lot of factors I have to take into

account in deciding what the appropriate sentence is, and one of those is the sentencing guidelines.  They are not mandatory anymore, so I'm not required to follow them, but I am required to consider them in deciding what the appropriate sentence is.  And the guideline in this case does provide for a guideline sentence, which I conclude is an appropriate guideline, of 8 months to 14 months in prison.  Again, I don't have to impose that sentence, but it's something to at least consider because one of the reasons the guidelines were created was because of the difference that people were receiving by way of a sentence when they go into one courtroom as compared to another courtroom.  So the guidelines were created so it would at least give us some idea of what an appropriate sentence is in a given case, although now we can vary from that and go down or above, if we think it is appropriate.

And then I have to look at the factors set forth in the United States Code.  And one of those is the nature of the crime that somebody has either pled guilty to or been convicted of.  And I consider this to be a very, very serious offense for the reasons I've indicated.  I think it goes to the heart of what America is supposed to be.  We've never had a situation where because people didn't agree with the result, they engaged in violence.  That's what you see in Third World countries. You don't expect to see that in the United States.  At least I never thought we would have something like this occur.

And I also, obviously, have to consider to what extent punishment is appropriate. And I believe, in reference to most crimes that people commit, that there has to be some element of punishment because if we don't, then what message are you sending? I think you're sending a message, if people don't get punished when they commit crime, is that crime pays and, therefore, why not do it because if I get caught, I don't have to pay a price for it. And I just don't think that's a message we want to send.

And we have to think about what is called deterrence, both specific deterrence -- maybe that's not something that's necessary for you all. I would hope that having experienced what you've experienced, that you wouldn't put yourself in a position like this again, where not only do you hurt yourself, but you hurt your family, you hurt your children, you hurt your image, you hurt your community, you hurt your nation.

I would hope that there is no need for there to be any specific deterrence in reference to you all, because I would hope the things that you've gone through, based upon what your lawyers say have happened, that there will be a sufficient specific deterrence as far as you are concerned. But, there also is what is called general deterrence. What message do you send to others that if you do crime, there's a consequence and maybe that stops people from doing what they do. And like I say, I have real fear about what's going to happen in November.

I sure hope we don't experience another January 6, or even worse. But I don't think it's beyond the pale that that in fact may happen because, as I say, the same mouthpieces that were saying the things before that riled people up to do what happened that day are still opening their mouth the same way and the words are still coming out the same way.

And I, as I say, I don't doubt that, unfortunately, there are some who, regardless of how compelling the vote may be, are not going to accept the result and, unfortunately, there're going to be people who, because they don't like the result, and because now we have a precedent for acting in violence if you don't get the result you want, I fear for what's going to happen again next November, if the result is not what certain people want it to be. And that's very scary, I think, for the future of our country.

I also have to consider to what extent things could be done in your life that may cause you not to commit further crime. And I, again, have no reason to believe that this was not an aberration and that, hopefully, this is something that would not happen again.

And I also have to consider the type of sentences available to me, which is all the way from probation all the way up to a prison sentence. And I also have to consider how other individuals who have a similar background, have committed similar crimes, how they have been treated. And, I think, you

know, still, even though we have guidelines, there are different sentences that happen in different locations, depending upon what the judge's perspective is.  And I don't think there's any way we can have total uniformity as to what the appropriate sentence is, but I try hard to try and not give a sentence that is far beyond or below what is happening in other courtrooms.

And having considered all the things I have to consider, and as tough as it is to have to impose sentencing -- it's one of the hardest things that judges have to do, when you have to decide someone's fate.  It's something that comes with the territory, so it's something that has to be done.  And it's very unfortunate because, like I say, whenever you impose a sentence, if it does result in separation of someone from the community, obviously it not only has an impact on that individual, but it also has an impact on others in their community or others who are part of their family who depend upon them.

And that's why people, you know, should think before they act.  And I would have hoped that you would have both, being parents, thought about what are the consequences of what I'm doing?  And if the police fear for their life and they shoot me, what happens to my kids?  What happens to my mother who depends upon me?  You all didn't think about that.  You didn't think about that.

You didn't think about the fact that this was so traumatizing to some of the police officers that they committed suicide and they're not with us anymore.  You contributed to that.  That's on your hands.  The fact that there are officers who lost their ability to work because they can't work anymore, they can't provide for their families like I'm sure they would like to, and that's on your hands.  You did that.  You contributed to that.  And because of that, there has to be a consequence.  As hard as it is and the impact that it has, there has to be a consequence.

So having considered, as I said, all that I've considered -- and, you know, Mr. Reyher, you and, you know, especially, and your wife to some degree also, you know, you were encouraging people to do what they did.  You didn't stand there silent and not say something.  And who knows, when you speak out and encourage people to act, you then become responsible for the acts that they engage in because you created the environment for it to take place.

And, you know, telling people to continue to push against the officers and try and gain access to the Capitol, I can't say definitively that it inspired people to act, but I also can't say it didn't.  And I assume, again, because of the group mentality and the things that were being said and the things that were being done contributed to the people doing what they did, whereas, maybe, if somebody had stood up and

said, Hey, stop this craziness, stop this, maybe other people would have joined in and maybe level heads would have caused the situation to not escalate to the point that it did.  But, Mr. Reyher, you contributed to this.

I mean, I looked at you, you know, on the film.  It's disgraceful for somebody to act the way you acted.  And that's it, there has to be a consequence.

So I do conclude that a guideline sentence is appropriate in your case.  And accordingly, I would sentence you to eight months in prison, followed by a period of three years of supervised release.  I also will not impose a fine, considering the fact that you, obviously, are going to be adversely impacted financially in light of the fact that you're going to have to be detained for some period of time.  But you did agree to paying $2,000 towards the $3 million-plus damage that was done to our Capitol.  So I'll require that you pay $2,000 in restitution.  And the law does require you pay $100 as a special assessment.

And, justifiably, I could have given you a greater sentence, all the way up to the statutory maximum of five years or the top of the guideline.  But in light of the fact that you don't have any prior criminal record and in light of the fact that other than this situation, you seem to be -- have lived a decent life, I have given you the bottom guideline sentence.  But I just conclude that I can't give less than that because of

the reasons I indicated.

As conditions of your supervised -- I will recommend that you be permitted to serve your sentence as close to your home as possible so that you can maintain contact with your children while you're detained.  I also will require, as conditions of your supervised release, that you not be rearrested for any reason whatsoever, whether it be for a federal, state, or local crime.

Also, that there's no indication of any illegal drug use, but the law does require that you not use any type of illegal drugs or possess illegal drugs while you're on supervision.  Also, you have to be tested at least once upon your release, within 15 days, to see if you are drug free.  And I'll leave it to the probation department to decide whether future testing is appropriate, if they think there is reason to do that.

You do have to provide a sample of your DNA so if you're involved in further crime, that can be used to identify you.  And the condition of restitution will be a condition of your supervised release.  And I'll require that you pay at least $200 per month, once you finish your prison sentence, towards the payment of that restitution.  And if you work while you're incarcerated and you make a salary while you're incarcerated, a portion of your pay will have to be deducted in order to pay for the restitution and the Court costs that you

owe.

I also will require that you perform 200 hours of community service, at least four hours per week, to pay back society for what you did.  And the restitution will be paid to the Architect of the Capitol, who is responsible for caring for the Capitol.

I will authorize the release of the presentence report to the appropriate entities who need it in order to carry out the orders of the Court.

And you do have 14 days from today's date to appeal your conviction and your sentence to the Court of Appeals.  And if you cannot afford to pay for a lawyer to represent you on appeal, or if you cannot pay for the papers to be filed with that court, those expenses will be paid free of charge by the government.

As far as Ms. Reyher is concerned, again, it's a tough call to make, especially in light of the fact that there are four minor children who are involved and those children are being homeschooled and the mother is the principal caretaker of those children, in addition to a mother who has her need. Obviously, it's difficult to decide exactly what the appropriate sentence is in this case.  But again, if we were talking about one entry into the Capitol and you left and that was it, that would be one thing.  But there's a second entry and then a third entry and then even the fourth time you're at

the gate -- at the entry to the tunnel and didn't leave.  And all of that is such that some period of detention is appropriate.

But I would conclude that for the reasons I indicated, that a sentence below the guidelines would be appropriate.  And accordingly, I will sentence you to 90 days in prison and will delay the actual imposition or execution of that sentence until, at the earliest, June 1st, so that, hopefully, June, July, and August, you can serve your sentence at that point and, therefore, will be available to continue to homeschool your children during the school year.  And then I'll place you on supervised release for a period of three years following the completion of the 90-day prison sentence.

And as I indicate, I varied downward from the guidelines because of your children and because of your mother and because you do not have any prior criminal record.  But again, I think the conduct was so serious that a period of detention as punishment needed to be imposed.

You also agreed to pay $200 (sic) in restitution, which I will impose, and that will be a condition of your supervised release.  You also have to pay $100 as a special assessment.  And, again, while you're detained, if you earn an income, a portion of that will have to be deducted in order for you to pay back, or pay the money that you're obligated to pay.  And once you finish your prison sentence, I will require that

as a condition of your supervised release, that you pay the restitution in the amount of at least $100 per month until the entire amount has been paid.

I will not impose community service in light of your obligations you have regarding your children and your mother. And again, the restitution will be paid to the Architect of the Capitol.

As conditions of your supervised release I'll require that you not be rearrested for any reason whatsoever while you're under supervision. Also, that you fully cooperate with the probation officer; which is the same, also, for Mr. Reyher. Also, that you do not use illegal drugs. And you have to be tested at least once when you are released to see if you do have drugs in your system. And periodically, if the probation department deems it appropriate, I will require that you submit to further drug testing, although there's no indication that that's necessary. But if probation has reason to believe that it's appropriate, I will authorize them to conduct drug testing.

You also have to provide a sample of your DNA so if you're involved in further crime, that can be used to identify you.

Those are the conditions that will be imposed. And you also have 14 days from today's date to appeal your conviction to the Court of Appeals. And if you cannot afford

to pay for a lawyer to represent you on appeal or if you cannot pay for the papers to be filed with the court, those expenses will be paid free of charge by the government.

And, also, the report can be released to the appropriate individuals or entities if needed in order to carry out the orders of the Court.

Probation, anything else?

THE PROBATION OFFICER:  No, Your Honor.

THE COURT:  Government, anything else?

MS. AKERS:  To be clear for the record, Your Honor, it sounded like you said $200 of restitution for Jessica Reyher.

THE COURT:  $2,000.  I'm sorry.  $2,000 restitution for both Mr. Reyher and Ms. Reyher.

MS. AKERS:  Nothing else.

THE COURT:  Anything else from the defense?

MS. MULLIN:  Your Honor --

THE COURT:  And I will permit Mr. Reyher, so that hopefully he can do whatever he needs to do in order to keep his business going, I will permit him to self-report.  And I also will permit Ms. Reyher to self-report, but would instruct the Bureau of Prisons that they should not have her report until June 1st, at the earliest.

MS. MULLIN:  Your Honor, just given her responsibilities at home, would the Court consider allowing her

to serve her time intermittently?

THE COURT:  It's unfortunate, but, like I say, the impact that this type of conduct has had on this country and on the future of this country, as far as the electoral process is concerned, is such that I just think some period of detention has to be imposed.  Thank you.

THE COURTROOM DEPUTY:  Your Honor, before you leave, will you be waiving the fines?

THE COURT:  Yes.  I meant -- I indicated that in reference to her.  But, yes, in reference to both, considering the restitution they're obligated to pay, I would waive the fine.

THE COURTROOM DEPUTY:  Thank you.  And also, the government needs to dismiss the remaining counts.

THE COURT:  Are there counts the government needs to dismiss?

MS. AKERS:  The government moves to dismiss the remaining counts against both defendants.

THE COURT:  Very well.  Motion granted.

MS. AKERS:  Thank you.

                    *   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER


    I, JANICE DICKMAN, do hereby certify that the above and

foregoing constitutes a true and accurate transcript of my

stenographic notes and is a full, true and complete transcript

of the proceedings to the best of my ability.

                         Dated this 22nd day of April, 2024




                              _____

                              Janice E. Dickman, CRR, CMR, CCR
                              Official Court Reporter
                              Room 6523
                              333 Constitution Avenue, N.W.
                              Washington, D.C.  20001